UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANTONY STARK | : | |
| Plaintiff | : | |
| v. | : | Civil Action No. 1:19-cv-12109-ADB |
| LONNIE G. BUNCH, SECRETARY, SMITHSONIAN INSTITUTION, | : | |
| Defendant | : | |

# AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## I. *INTRODUCTION*

1. This is an action for equitable and legal relief to redress the deprivation of rights secured to the Plaintiff Antony Stark by Section 7 of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"), and for breach of the covenant of good faith and fair dealing, pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and the "Little Tucker Act," 28 U.S.C. § 1346(a)(2).

## II. *JURISDICTION*

2. The jurisdiction of the Court over this controversy is based upon Section 7 of the ADEA, 29 U.S.C. § 626, and 28 U.S.C. § 1337 to enforce the provisions of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* The conditions precedent to suit have been satisfied, to wit, more than 180 days has passed since the Plaintiff timely initiated a charge of discrimination with the Equal Employment Opportunity Commission and no final action has been taken. Jurisdiction to hear Plaintiff's claim for breach of the covenant of good faith and fair dealing is accorded by 28 U.S.C. §

1346(a)(2).

## III. *VENUE*

3.    The unlawful employment practices alleged below were committed within the town of Cambridge located in the County of Middlesex, Massachusetts. Accordingly, venue lies in the United States District Court for the District of Massachusetts, under 28 U.S.C. § 1391(b).

## IV *PARTIES*

4.    Plaintiff Antony Stark is an individual residing in Cambridge, Middlesex County, Massachusetts.

5.    Defendant Lonnie G. Bunch is the Secretary of the Smithsonian Institute. He is sued in his official capacity for actions of the Smithsonian Astrophysical Observatory ("SAO") that took place in Cambridge, Middlesex County, Massachusetts.

## V. *STATEMENTS OF FACTS*

6.    Dr. Stark was born in 1953, and is therefore protected by the ADEA.

7.    Dr. Stark has been employed by the SAO since 1991, and throughout that time has consistently received the highest possible Annual Performance Review ratings, and has been promoted through the ranks from "Astronomer" to "Senior Astronomer."

8.    When he was first hired by the SAO, Dr. Stark had been a member of the Technical Staff of Bell Laboratories for 12 years, and was a Lecturer in Astrophysical Sciences at Princeton University. At Bell Labs, Dr. Stark developed novel detectors for millimeter-wave bands and used them for astronomical observations, including making the first millimeter-wave band astronomical observations from the U. S. Antarctic Program's Amundsen-Scott South Pole Station in 1987.

9. Dr. Stark realized that the transparent and stable atmosphere over the South Pole warranted the establishment of a permanent observatory there, and won a grant from the National Science Foundation ("NSF") in 1989 to build the Antarctic Submillimeter Telescope and Remote Observatory ("AST/RO"). Dr. Stark was also one of four founders of the Center for Astrophysical Research in Antarctica, a Center also funded by the NSF that began operations in 1990.

10. When Dr. Stark first applied to work at the SAO in 1991, he was told by then-Director Irwin Shapiro that he should not seek employment at the SAO as a federal-General Schedule ("GS") employee because there was then a policy that federal scientists could not hold NSF grants (as Dr. Stark then did). Director Shapiro offered to hire Dr. Stark as a "Smithsonian Trust" employee, which he said had parallel requirements and benefits (including job security) to federal GS scientists. Director Shapiro assured Dr. Stark that this position as a "Smithsonian Trust" employee would be "as secure as tenure," promising that should the NSF cease to fund Dr. Stark's work in the future, Dr. Stark would be fully funded by the Smithsonian Trust or could be transitioned to a federal GS position.

11. At the time of these conversations in 1991, Shapiro was the Director of the SAO and had the authority to either appoint individuals to GS positions, or to enter into contracts on behalf of the Smithsonian with Smithsonian Trust employees (non-GS positions). Director Shapiro's authority to enter into contracts with Smithsonian Trust employees derives from the Act of Congress establishing the Smithsonian Institution, 9 Stat. 102 (1846).[1] Director Shapiro entered into a contract with Dr. Stark, one of the terms

---

[1] According to a 1959 letter from the Secretary of the Smithsonian Institution, "there are two different groups of employees in the Astrophysical Observatory. Employees supported by private funds, grants and contracts are carried on the 'private rolls' and are non-Federal. Their terms and conditions of employment are at the discretion of the Secretary of the Smithsonian Institution."

3

of which was that Dr. Stark would be paid a salary, and that the Smithsonian Trust would fully fund his work if grants did not, and that his position would be as "secure as tenure." It was on the basis of this agreement that Dr. Stark accepted a position at the SAO. Dr. Stark would otherwise have accepted one of several possible positions at other institutions as a tenured Professor of Astronomy.

12. In the 24 years between 1991 and 2015, Dr. Stark's work flourished at the SAO:

    a. During his first 15 years, the AST/RO project funded 18 post-doctoral appointments and a Project Manager position at the SAO;

    b. In 1997 and 2000, Dr. Stark was first author on two scientific publications advocating the building of a 10-meter diameter telescope at the South Pole, construction of which was then funded in 2003;

    c. Dr. Stark was one of five Co-Investigators (and the designer of the optics) of the South Pole Telescope (SPT), which began operations in 2007, and became widely recognized as a premier observational instrument; the SPT is also used as a component of the world-wide "Event Horizon Telescope" that in the past year made the first image of a black hole, earning Dr. Stark a share in the prestigious 2020 Breakthrough Prize in Fundamental Physics;

    d. In 2013, Dr. Stark and Dr. Niels Halverson collaborated in the optical design of a third-generation detector system ("SPT-3G") that increased the sensitivity of the SPT by a factor of 20 — this instrument is currently operational; it is the world's most sensitive instrument observing the

Cosmic Microwave Background, continues to make the currently most accurate measurements in observational cosmology, and is expected to lead to the discovery of about 6,000 previously unknown clusters of galaxies.

    e.    Thereafter, Dr. Stark and Dr. Christopher Stubbs proposed and won an NSF grant to build the Parallel Imager for Southern Cosmology Observations ("PISCO"), a photometric camera for the Magellan telescopes at Las Campanas Observatory that is several times faster than any previous photometric imager, in order to make the first optical images of the newly-discovered clusters;

    f.    Dr. Stark designed, constructed and deployed PISCO to Magellan, and in 2015 PISCO became the world's fastest and most accurate ground-based astronomical camera that has so far been used to image more than 800 previously-unknown clusters of galaxies as well as other projects, for example the discovery of an Earth-like planet around a star only 42 lightyears distant.

13.    In the late 2000's, recognizing that the instrument-building grants for the SPT and other instruments would eventually run out (though they had not yet run out), Dr. Stark approached SAO Director Charles Alcock about providing salary support for his work in *using* these instruments for the observational purposes for which they were built—that is, the detection and characterization of thousands of clusters of galaxies. In other words, after successfully pursuing an astronomical research program of national importance for decades, Dr. Stark asked the SAO for a few years of salary support in order to complete the research on identifying galaxy clusters for which he had spent decades

5

laying the groundwork.

14. At the time of this conversation, Dr. Stark's salary was still being fully funded by a combination of grants he was raising and funding from the SAO. In response to Dr. Stark's request, however, Director Alcock told him he should apply for a federal-GS position at the SAO, reassuring Dr. Stark that there would be many federal positions for which he could apply.

15. Dr. Stark proceeded to apply for the next federal scientist position that was posted at the SAO, a GS-13 position. He was not selected for the position, and simply told to re-apply.

16. In March 2016, at age 62, Dr. Stark applied again for two federal scientist positions at the SAO, one at the GS-14 level and one at the GS-15 level. Again, he was not selected for either position, even though he was found to be among the best qualified for the positions. Instead, in September 2016, Director Alcock announced that the SAO would be interviewing six other candidates for what he described in an email as the "mid-career" scientist position. The scientists selected for interviews were all in their forties and fifties.

17. By definition, by having the highest possible performance evaluations for years in a Senior Astronomer position, higher in grade than GS-15, Dr. Stark was more than qualified for the GS-14 and 15 positions for which he applied in 2016, yet he was not even included among the finalists who were selected to be interviewed.

18. When Dr. Stark protested to Director Alcock that he was not included among the finalists for the "mid-career" federal scientist position, Director Alcock proceeded to hire none of the other scientists, yet did not allow Dr. Stark to continue to

compete for the position, and instead left the position unfilled.

19. In sum, after the SAO collected millions of dollars in grants brought in by Dr. Stark over more than two decades, it put Dr. Stark, an accomplished 62-year old Senior Astronomer, in the position of having to compete to continue in his job with a group of younger, mid-career scientists, and then did not select him.

20. Up until September 2016, Dr. Stark was assured and expected that the SAO would find a way to fund his work so that he had a position "as good as tenure." At that point, however, it became clear that the SAO would not hire him for a GS position because of his age, and it would not pay his salary if he could not raise it, and that he therefore had a claim of age discrimination and a claim for breach of contract.

## VI. *CLAIM FOR AGE DISCRIMINATION*

21. Plaintiff repeats and realleges the allegations of paragraph 1 through 20.

22. The SAO intended to and did discriminate against Dr. Stark on the basis of his age, in violation of the ADEA.

23. The reasons given for not selecting Dr. Stark for a federal scientist position were not true, not worthy of belief, and a pretext for age discrimination.

24. The SAO has engaged in a pattern or practice of age discrimination by hiring and paying scientists only for so long as they are bringing in grant monies, and then, when they get older, requiring them to compete for their positions with younger colleagues and/or failing to pay them at all.

25. The SAO's conduct was motivated in whole or in part by an intent to discriminate against the Plaintiff on the basis of his age, in violation of the ADEA.

26. The SAO's conduct represents a willful violation of section 4(a)(1) and (2)

of the ADEA, by maintaining age-based employment policies which have the effect of excluding qualified employees, including Plaintiff, from employment opportunities, on the basis of age.

27. The SAO has willfully engaged in a policy or practice of arbitrarily and summarily discriminating against employees, including the Plaintiff, on the basis of age, in violation of the ADEA.

28. The SAO's discriminatory conduct, policies, and practices regarding workplace treatment, compensation, promotion and retention violate the ADEA.

29. The SAO has failed in its affirmative duty under the ADEA, by its failure to exercise reasonable care and diligence, to maintain a work environment free of discrimination against older workers.

30. As a direct and proximate result of the SAO's violations of the ADEA, Dr. Stark has suffered damages. Dr. Stark has been:

    a. Treated in a hostile, demeaning, and otherwise unlawful manner;

    b. Deprived of the status, benefits, privileges, and other terms and conditions accruing to the employment relationship to which he was entitled; and

    c. Lost income, suffered humiliation and emotional distress, and incurred harm to his personal and professional reputation.

## VII. *CLAIM FOR BREACH OF COVENANT OF GOOD FAITH*

31. Plaintiff repeats and realleges the allegations of paragraphs 1 through 30.

32. At the time he accepted employment with the SAO in 1991, Dr. Stark, then age 38, was a successful, well-compensated scientist with substantial federal grant funding for his work from the NSF.

33. Then-Director Shapiro induced Dr. Stark to accept employment with the SAO as a "Smithsonian Trust" employee, rather than as a salaried GS federal scientist, based on an agreement that the Smithsonian Trust would fully fund his work if grants did not, and that his position would be as "secure as tenure." As Director of the SAO, Shapiro had express or implied authority at the time to enter into contracts with Smithsonian Trust employees. Were it not for this agreement, Dr. Stark would not have accepted the position with the SAO.

34. By failing to honor this agreement in 2016, that is, by failing to fully fund Dr. Stark's salary if grants did not, and instead requiring Dr. Stark, then age 62, to compete for his position with younger scientists, the SAO breached the covenant of good faith and fair dealing that is implied in all contracts for employment.

35. As a direct and proximate result of the SAO's breach of the covenant of good faith and fair dealing, Dr. Stark has suffered damages. Dr. Stark has been:

    a. Treated in a hostile, demeaning, and otherwise unlawful manner;

    b. Deprived of the status, benefits, privileges, and other terms and conditions accruing to the employment relationship to which he was entitled; and

    c. Lost income, suffered humiliation and emotional distress, and incurred harm to his personal and professional reputation.

36. Pursuant to the "Little Tucker Act," Dr. Stark waives any recovery of monetary damages on this claim above $10,000.

***PRAYER FOR RELIEF***

WHEREFORE, Plaintiff prays that the Court enter judgment against the SAO and

in favor of Plaintiff for all damages and equitable relief available, including, but not limited to:

A. Order that the Defendant make whole the Plaintiff by awarding appropriate lost earnings, benefits, and interest, in amounts to be proved at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to the restoration of Plaintiff to a current position of compensation with all benefits;

B. Award Plaintiff an entire remedy and complete relief under the Tucker Act and the Little Tucker Act, including restoration to office or position, and monetary damages in an amount not to exceed $10,000;

C. Award Plaintiff his attorneys' fees and the costs of this action;

D. Grant an appropriate award of prejudgment interest, including an award of interest for all damages awarded to the Plaintiff from the date this cause of action accrued;

E. Grant such other and further relief as this Court deems necessary and proper.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE.**

                    For the Plaintiff,

                    */s/ Andrew Rainer*
                    Andrew Rainer (BBO #542067)
                    Brody, Hardoon, Perkins & Kesten LLP
                    699 Boylston Street, 12th floor
                    Boston, MA 02116
                    (617) 304-6052

Dated: September 4, 2020

<u>Certificate of Service</u>

I hereby certify that, on this 4th day of September, 2020, I served the foregoing Amended Complaint on defense counsel of record by posting in the Court's electronic filing system.

<u>/s/ Andrew Rainer</u>